# IN THE UNITED STATES DISTRICT COURT
# FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| SYLVESTER ELLIS | : |
| | : |
| | : CIVIL ACTION |
| v. | : |
| | : NO. 18-5046 |
| | : |
| CITY OF PHILADELPHIA, *et al.* | : |

## **MEMORANDUM**

**YOUNGE, J.**                                                                                     **FEBRUARY 10, 2020**

In this 42 U.S.C. § 1983 action, Plaintiff asserts that Defendants violated his Eighth and Fourteenth Amendment rights when Defendants failed to prevent and appropriately respond to an incident in which Plaintiff was violently assaulted by a co-inmate. Plaintiff also alleges that Defendants denied critical medical care subsequent to the incident, and further violated his due process rights in relationship to a subsequent internal disciplinary proceeding instituted against him.

Now before the Court is Defendants' Motion for Summary Judgment pursuant to Federal Rule of Civil Procedure 56 ("Mot.," ECF No. 11). The Court finds this matter appropriate for resolution without oral argument. Fed. R. Civ. P. 78; L.R. 7.1(f). For the reasons that follow, Defendants' Motion will be granted.

**I. BACKGROUND**

    **A. Facts**[1]

---

[1] Unless indicated otherwise or where attributed to one party or another, to the extent any of these facts are disputed the Court concludes they are not material to the disposition of the pending motion. Further, to the extent the Court relies on evidence to which the parties have objected, the Court has considered and overruled those objections—unless discussed herein. As to any remaining objections, the Court finds it unnecessary to rule on them because the Court does not rely on the disputed evidence.

This matter arises from an altercation that occurred on November 21, 2016, at Curran-Fromhold Correctional Facility ("CFCF") in the Philadelphia County Prison System. (Complaint (ECF No. 1).) The Plaintiff was being held awaiting trial on aggravated assault and gun charges that ultimately led to a conviction on which he is currently serving a sentence of six to fourteen years. (Deposition of Sylvester Ellis at 11 ("*Ellis Dep.*" ECF No. 11-3).) About three weeks into his stay at CFCF, Plaintiff was moved to a cell block that housed a man named Eric William who Plaintiff recognized as the man he suspected of killing Plaintiff's stepson. (*Id.* at 32-33.)

The Plaintiff telephoned the mother of his son, who was also his stepson's mother, to exchange information and to confirm William's identity. (*Id*. at 33.) Plaintiff was familiar with the prison environment. He had previously been convicted of crimes and had served more than fourteen years in prison. (*Id*. at 14.) Yet, Plaintiff did not alert prison officials or correction officers to the fact that he was being housed with the person he believed had murdered his stepson. (*Id.* at 33.) Plaintiff testified that prior to the altercation that is the basis of this lawsuit and even after his hospitalization, he told no one other than the mother of his son that he recognized William as the murderer of his stepson. (*Id.*)

On November 21, 2016, when Plaintiff had been on the same cell block with William about one week, William confronted Plaintiff and told him that he had heard that Plaintiff was attempting to obtain a knife to stab William because William had killed Plaintiff's stepson. (*Id.* at 16-17.) Plaintiff asked William who told him this, then Plaintiff went up to the person William had identified, who confirmed that Plaintiff was not looking for a knife. (*Id.* at 36.) According to the Plaintiff, he then excused himself from the conversation to return to his assigned cell. (*Id*. at 17.)

To re-enter his assigned cell that was locked at the time, the Plaintiff had to ask a guard to open the door that would then be re-locked behind him. (*Id.* at 18, 58-59.) Critically, the Plaintiff did not alert the correctional officer who was operating the door to the fact that he and William had just had a verbal confrontation. (*Id.* at 41.) The guard opened the door and re-locked it behind the Plaintiff. William gained entry to the cell that was assigned to the Plaintiff. (*Id.* at 19.) Once the two men were inside the cell with the door locked, William attacked the Plaintiff. (*Id.*)

Plaintiff was severely beaten and sustained serious injuries in the assault. (*Id.* at 48-50). To briefly summarize, Plaintiff's scrotum and forehead were lacerated and required sutures; his left eye socket or orbital bone was broken along with two teeth; he suffered two fractured vertebrae and now uses a cane to ambulate; and his jaw mobility was decreased due to facial nerve damage. (*Id.*; *see also* Aria Health Discharge Summary, ECF No. 19-1.)

Plaintiff was taken to a local hospital where he was admitted for treatment. Plaintiff was discharged from the hospital on November 25, 2016, and was returned to CFCF. (*Id.* at 28.) He requested use of a wheelchair during transport, and this request was denied. (*Id.* at 28.) Instead, he was provided with a cane and he was told to walk to the van that would transport him back to CFCF. (*Id.* at 27.) Upon arrival, he was placed in a handicapped cell in protective custody. (*Id.* at 30.) Through the prison internal disciplinary process, Plaintiff was charged with fighting and was disciplined following an investigation. (*Id.* at 53-65.)[2]

In reference to the Plaintiff's claim that Defendants' failed to provide appropriate medical care for his injuries, Plaintiff testified that "the lack of treatment caused my back to heal

---

[2] William ultimately pled guilty to criminal charges related to assaulting Plaintiff. (*Id.* at 104). Videos associated with the assault and photographs of Plaintiff's injuries were also introduced at William's homicide trial for the killing of Plaintiff's stepson, Brian Anthony Younger, Sr. (*Id.* at 44-45.)

crooked." (*Id*. at 50.) He specifically referenced the fact that he was given only one mattress to sleep on and that his request for two mattresses was denied. (*Id.* at 50, 80-81.) Plaintiff also testified to a delay in receiving physical therapy but admitted that physical therapy was eventually provided. (*Id*. at 97.) Plaintiff's own testimony establishes that he received medical care while at CFCF, and while he was held in the Philadelphia Prison System. (*Id.* at 101-102.) His testimony also establishes that he received treatment for his dental injuries. (*Id*. at 99.)

The uncontested medical records produced by the Defendants in moving for summary judgment establish that Plaintiff was provided with extensive medical treatment while housed in the Philadelphia Prison System. (ECF No. 11-9-13.) Plaintiff was discharged from Aria Health on November 25, 2016 (ECF No. 19-1 at 10.) The discharge instructions in the discharge summary from Aria Health state, "The Patient is to follow up with [Oral and Maxillofacial surgeon] in one week. He was given a prescription of 20 oxycodone. He is also to take Tylenol for pain as well as Lidoderm patch for his lower lumber transverse process fracture . . . The patient is to have scrotal sutures removed on 11/28/2016. The patient to follow up with PCP in one week." (ECF No. 19-1 at 12.)

The Plaintiff's medical records indicate that he was seen by Dr. Michele Dilauro on November 25, 2016, immediately after returning to CFCF. (ECF No. 11-11 at 36.) Medical staff in the Philadelphia Prison System were clearly aware of the fact that the discharge papers from Aria Health recommended that Plaintiff be seen by an Oral and Maxillofacial surgeon. (*Id.* at 14.) The Plaintiff's medical records further indicate that medical staff placed a request for Plaintiff to be evaluated by an Oral and Maxillofacial surgeon, and that this request was pending approval as of November 28, 2016, (ECF No. 11-11 at 28.) The request was approved, and Plaintiff ultimately saw an Oral and Maxillofacial surgeon on December 22, 2016. (ECF No. 11-

4

10 at 124.) The Oral and Maxillofacial surgeon who evaluated Plaintiff recommended that surgery was not required. (*Id.*)

Progress notes from November 30, 2016, indicate that Plaintiff's scrotal stitches were examined, and were determined to be subcuticular absorbable sutures that did not need removal. (ECF No. 11-11 at 15.) Plaintiff's facial sutures were removed on December 9, 2016. (ECF 11-10 at 140.) The progress notes state, "sutures removed without any problems, wounds have healed." (*Id.*) Plaintiff was referred to an Optometrist for complaints about blurred vision. (*Id.* at 124 & 140.) Progress notes from February 27, 2017, indicate that Plaintiff's skin wounds had healed. (*Id.* at 124.) Progress notes indicate that the Plaintiff was seen by a dentist on May 12, 2017, May 17, 2017, June 2, 2017, September 18, 2017 and October 2, 2017. (*Id.* at 51, 61, 102, 104-14.) The Plaintiff refused treatment for his dental injuries and refused to have his broken tooth or teeth extracted. (*Id.*) The records further indicate that Plaintiff's damaged tooth or teeth were ultimately extracted in October of 2017. (*Id.* at 51.)

With specific reference to Plaintiff's facial injuries, he requested physical therapy in December of 2017. (*Id.* at 6-8.) Progress notes indicate that Plaintiff complained of facial numbness and continuing problems with his jaw. (*Id.*) Plaintiff received instruction on how preform independent physical therapy and was monitored by medical staff. (*Id.* at 1,3,6-8 & 10.) The progress notes indicate that physical therapy for facial injuries continued through the winter and early spring of 2018 with guidance and oversight from prison medical staff. (ECF No. 11-9 at 99-100.)

With specific reference to Plaintiff's spinal injury and persistent complaints of back pain, the progress notes indicate that Plaintiff requested physical therapy on June 15, 2017. (*Id.* at 98.) He was provided with an initial evaluation on June 27, 2017. (*Id.* at 96.) He received more

5

physical therapy on June 30, 2017, and this therapy continued once or twice a week through the summer of 2017. (*Id.* at 78, 76-88, 90-94 96 & 98.)

   B. **Procedural History**

Based on the foregoing, Plaintiff filed this action on November 20, 2018. (ECF No. 1.) In the caption of his complaint, he named as Defendants, the City of Philadelphia, Commissioner Blanche Carney, Warden John Delaney, Warden Michele Farrell, Warden Cathy Talmadge, Captain R. Rose, Lieutenant S. Golden-Devaux, Sargent A. Lebesco, Correctional Officer S. Bates, Correctional Officer Murray, Correctional Officer R. Eure, and Correctional Officer M. Carasquero. Plaintiff asserts five claims for relief:

> **COUNT 1**: 42 U.S.C. § 1983—Eighth and Fourteenth Amendment violation for failure to protect, asserted against the CFCF Correctional Officers;
>
> **COUNT 2**: 42 U.S.C. § 1983—Eighth and Fourteenth Amendment violation for failure to train and supervise, asserted against the City, Commissioner Carney, Warden Delaney, Lieutenant Golden-DeVaux, and Captain Rose;
>
> **COUNT 3**: 42 U.S.C. § 1983—Eighth and Fourteenth Amendment violation for denial and delay of medical care, asserted against CFCF Correctional Officers;
>
> **COUNT 4**: 42 U.S.C. § 1983— Fourteenth Amendment violation for failure to train and supervise, asserted against the City, Commissioner Carney, Warden Delaney, Warden Farrell, and Warden Talmadge;
>
> **COUNT 5**: 42 U.S.C. § 1983—Fourteenth Amendment Procedural Due Process violation, asserted against the City, CFCF Commissioner Carney, and Warden Delaney.

(*Id.* ¶¶ 92-134.)

Defendants filed the instant Motion for Summary Judgment on September 3, 2019. Plaintiff filed his opposition to Defendants' Motion on September 24, 2019 ("Opp.," ECF No. 12). Defendants filed a reply on October 31, 2019 ("Reply," ECF No. 16). On December 11,

2019, Plaintiff filed the exhibits that were referenced in, but apparently inadvertently omitted from, his Opposition. (ECF No. 19.)

## II. LEGAL STANDARD

Summary judgment is appropriate only if there is no genuine issue of material fact and the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(a); *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). The court shall render summary judgment "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." *Fed. R. Civ. P. 56(c)*. An issue is "genuine" only if there is a sufficient evidentiary basis on which a reasonable jury could find for the non-moving party. *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 249 (1986). A factual dispute is "material" only if it might affect the outcome of the suit under governing law. *Id.* All inferences must be drawn, and all doubts resolved in favor of the non-moving party. *See United States v. Diebold, Inc.,* 369 U.S. 654, 655 (1962); *see also Gans v. Mundy*, 762 F.2d 338, 341 (3d Cir. 1985).

On a motion for summary judgment, the moving party bears the initial burden of identifying those portions of the record that it believes demonstrate the absence of material fact disputes. *See Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). To defeat summary judgment, the non-moving party must respond with facts of record that contradict the facts identified by the moving party and may not rest on mere denials. *Id.* at 321, n.3; *see First Natl. Bank of Pa. v. Lincoln Natl. Life Ins. Co.,* 824 F.2d 277, 282 (3d Cir. 1987). In a case where the non-moving party is the plaintiff and therefore bears the burden of proof, the non-moving party must, by affidavits or by the depositions and admissions on file, "make a showing sufficient to establish

the existence of [every] element essential to that party's case." *Celotex,* 477 U.S. at 322-24. The non-moving party must adduce more than a mere scintilla of evidence in its favor to defeat the moving party's summary judgment motion. *See Williams v. Borough of West Chester, Pa.,* 891 F.2d 458, 460 (3d Cir. 1989).

## III. DISCUSSION

Defendants move for summary judgment on all of Plaintiff's claims. (*See generally* Mot.) The Court will discuss each claim in turn. However, prior to reaching the substance of Plaintiff's claims, it should be mentioned that Plaintiff never filed a grievance in relationship to his failure to protect or failure to provide medical care claims; therefore, he failed to exhaust administrative remedies on these claims. Generally, inmate litigants are required to exhaust administrative remedies prior to seeking relief from the court.[3] However, for the purpose of this Opinion, the Court will conduct a substantive review of Plaintiff's claims.

In relationship to the failure to protect claim, and for the purpose of this Opinion only, this Court will accept the Plaintiff's argument that administrative remedies were unavailable in the days following his assault. This Court will also review Plaintiff's failure to provide medical care and *Monell* claim based on a failure to train and supervise regarding the provision of medical care. The record in this matter clearly establishes that Plaintiff received medical care while he was housed in the Philadelphia Prison System. Therefore, his claim of deliberate

---

[3] The Prison Litigation Reform Act (PLRA) provides: "[n]o action shall be brought with respect to prison conditions under section 1983 of this title, or any other Federal law, by a prisoner confined in any jail, prison, or other correctional facility until such administrative remedies as are available are exhausted." 42 U.S.C. § 1997(e) (2006). The United States Supreme Court and the Third Circuit have held that this provision means what it says. *See Porter v. Nussle*, 534 U.S. 516, 532, (2002) ("[W]e held that the PLRA's exhaustion requirement applies to all inmate suits about prison life, whether they involve general circumstances or particular episodes, and whether they allege excessive force or some other wrong."); *see also Spruill v. Gillis*, 372 F.3d 218, 227 (3d Cir. 2004); *Casey v. Smith*, No. 02-4245, 71 F. App'x. 916, 918 (3rd Cir. 2003) (with limited exception inmates must file a grievance prior to pursuing a lawsuit in federal court un 42 U.S.C. § 1983).

8

indifference is without merit. Finally, this Court will conduct a substantive review of the Procedural Due Process claim brought in relationship to the disciplinary sanctions that Plaintiff received through the prison system's internal disciplinary process because he had filed an internal appeal of those sanctions.

A. **Failure to Protect Claim (Count I)**

Summary judgment is appropriate on Plaintiff's failure to protect claim because he fails to establish that prison officials were deliberately indifferent to a substantial risk of harm. Plaintiff alleges that the CFCF correctional officer Defendants improperly permitted William to enter Plaintiff's cell, failed to monitor him while he was locked in his assigned cell, and failed to respond when other inmates gathered outside of his cell to watch while he was being attacked. (*Opp*.at 6.)

Prisoners being held in pretrial detention have a constitutional right to protection from violent assault at the hands of fellow inmates. *Hamilton v. Leavy*, 117 F.3d 742, 746 (3d Cir. 1997). The Eighth Amendment imposes "a duty on prison officials to take reasonable measures to protect prisoners from violence at the hands of other prisoners." (*Id*.) This Eighth Amendment protection has been recognized as applicable to pretrial detainees under the Fourteenth Amendment.[4] *Bell v. Wolfish*, 441 U.S. 520, 545 (1970); *Simmons v. City of Phila.*, 947 F.2d 1042, 1067 (3d Cir. 1991); *Brown v. Borough of Chambersburg*, 903 F.2d 274, 278 (3d Cir. 1990); *Kost v. Kozakiewicz*, 1 F.3d 176, 188 (3d Cir. 1990) (the standard for violation of the Eighth Amendment based on non-medical conditions of confinement . . . would apply to pretrial detainees through the Due Process Clause).

---

[4] In this Opposition, the Plaintiff argues he was entitled to greater protection under the Constitution because, at the time of the attack, he was a pretrial detainee who had not been convicted of a crime. (*Opp.* at 9.)

In order to establish a failure to protect claim, an inmate must demonstrate that: (1) he is "incarcerated under conditions posing a substantial risk of serious harm;" and (2) the prison official acted with "deliberate indifference" to his health and safety. *Farmer v. Brennan*, 511 U.S. 825, 834 (1994). To be deliberately indifferent, a prison official must both "know . . . of and disregard . . . an excessive risk to inmate health or safety." *Id.* at 837. This standard is subjective, not objective, "meaning that the official must actually be aware of the existence of the excessive risk; it is not sufficient that the official should have been aware." *Beers-Capitol v. Whetzel*, 256 F.3d 120, 131 (3d Cir. 2001); *see also Jones v. Beard*, 145 F. App'x. 743 (3d Cir. 2005) (finding no Eighth Amendment violation where inmate-plaintiff complained about his cellmate who had a history of psychological problems, but where plaintiff failed to articulate a specific threat of harm during the weeks prior to the attack).

In *Rivera v. Josephwicz*, No. 14-319, 2017 U.S. Dist. Lexis 109627, at *13 (M.D. Pa. July 13, 2017), the court granted summary judgment where it found that, "Defendant [correction officers] never knew that [plaintiff] faced a substantial risk of serious harm." *Id*. at *13. In *Rivera*, plaintiff was stabbed in his sleep by his cellmate who allegedly had prior history of violent altercations with previous cellmates. Three days prior to the stabbing, the plaintiff had requested a transfer after the two men had a disagreement about certain personal issues. *Id*. Critical to the court's analysis in *Rivera* was plaintiff's admission that there was no prior indication that he would be stabbed or physically assaulted over the disagreement. *Id*. Like Plaintiff in this case, the plaintiff in *Rivera* never requested to be placed in protective custody, nor did he voice a concern to prison officials about an excessive risk to his health or safety. *Id*.

In *Bizzell v. Tennis*, 11-1529, 449 F. App'x. 112 (3d Cir. 2011), the Third Circuit applied similar logic in affirming the district court's grant of summary judgment in a case involving an

assault on plaintiff by his cellmate. Prior to the assault, the plaintiff had complained to several prison staff members about his cellmate's erratic and aggressive behavior. The plaintiff also found a bolt hidden in his cell, which he turned over to prison officials fearing that it could be fashioned into a weapon. *Id.* The plaintiff averred that he reached out to staff members just prior to the assault to seek help based on his belief that he would be attacked by his cellmate. However, the Third Circuit upheld the grant of summary judgment based on the fact that there was no "indication that the defendants were aware of a serious risk posed to the [plaintiff]." *Id*. at 115. The Court, in *Bizzell*, cited the fact that the two had not previously fought, coupled with the fact that the plaintiff's complaints to prison staff focused primarily on his cellmate's instability and not on any specific risk of harm to the plaintiff. Thus, in *Bizzell*, the facts surrounding the assault did not "demonstrate the deliberate indifference to a serious risk of harm required for liability under the Eight Amendment." *Id*. at 115.

In the case *sub judice*, Plaintiff's failure to alert prison officials to the personal history and potential animosity between himself and William is fatal to his claim that they failed to protect him in violation of his constitutional rights. Although Plaintiff had previously been incarcerated and was familiar with the prison environment and administrative system, he nonetheless failed to alert prison officials to the fact that he believed that William had murdered his stepson or any concern that William posed an excessive risk to his health or safety. Therefore, he cannot establish that prison officials were deliberately indifferent to a substantial risk of harm. Deliberate indifference requires more than mere negligence, and imposes a standard that Plaintiff has failed to meet.

### B. Municipal Liability (*Monell* Claim)
### Failure to Protect - Failure to Train and Supervise

Summary judgment is appropriate on the municipal liability claim brought against the City of Philadelphia and various Defendants for failure to protect because the Plaintiff cannot establish that the City or its officials were aware of any problem with the system or policy for monitoring and patrolling the inmate housing units at CFCF. (*Opp.* at 7.) Under his failure to train and supervise theory, Plaintiff argues that William should never have been permitted to enter his assigned cell. (*Opp.* at 7, 9.) He further alleges that correctional officers should have investigated the situation when other inmates gathered outside of his cell to watch the assault. (*Id.*) Plaintiff offers the expert report of Richard J. Subia, who opines that CFCF lacked written guidelines that explicitly explained how corrections officers should monitor the housing area and how often they should patrol the cell block. (*Expert Report of Richard J. Subia* at 6, ECF No. 11-8; *Amended Document, Rebuttal Report of Richard J. Subia* at 5, ECF No. 19-1.) Subia points to the lack of written guidelines and of established policy and opines that this created an inconsistent policy for monitoring inmates. (*Id.*)

In *Monell v. Department of Social Services of City of New York*, 436 U.S. 658, 690 (1978), the Supreme Court established the standard for municipality liability under 42 U.S.C. § 1983. The Supreme Court wrote, "[M]unicipalities and other local government units [are] included among those persons to whom § 1983 applies." *Id*. at 694. However, "a municipality cannot be held liable under § 1983 on a respondeat superior theory." *Id*. "Instead, it is when execution of a government's policy or custom, whether made by its lawmakers or by those whose edicts or act may fairly be said to represent official policy, inflicts the injury that the government as an entity is responsible under § 1983." *Id*. at 694. In order to prevail on a *Monell* claim, a plaintiff must establish deliberate indifference. For a municipality's failure to train or

supervise to amount to deliberate indifference, it must be shown that: (1) municipal policymakers know that employees will confront a particular situation; (2) the situation involves a difficult choice or a history of employees mishandling; and (3) the wrong choice by an employee will frequently cause deprivation of constitutional rights.[5] *Carter v. City of Phila.*, 181 F.3d 339, 357 (3d Cir. 1999).

"'[D]eliberate indifference' is a stringent standard of fault, requiring proof that a municipal actor disregarded a known or obvious consequence of his action." *Bd. Of Cnty. Comm'rs of Bryan Cnty., Okl. v. Brown*, 520 U.S. 397, 410 (1997) (where plaintiff alleged a constitutional violation based on allegations of an inadequate background check and subsequent decision to hire an officer). Ordinarily, "[a] pattern of similar constitutional violations by untrained employees" is necessary "to demonstrate deliberate indifference for purposes of failure to train." *Connick v. Thompson*, 563 U.S. 51 (2011). "Without notice that a course of training is deficient in a particular respect, decisionmakers can hardly be said to have deliberately chosen a training program that will cause violations of constitutional rights." *Id*. A pattern of violations puts municipal decisionmakers on notice that a new program is necessary, and "[t]heir continued adherence to an approach that they know or should know has failed to prevent tortious conduct by employees may establish the conscious disregard for the consequences of their action — the 'deliberate indifference' — necessary to trigger municipal liability." *Bryan Cnty.*, 520 U.S. at 407 (1997).

---

[5] The correction officers in the case *sub judice* cannot be said to have faced a difficult choice because, as previously mentioned, Plaintiff never told them that he was being housed with a man who he believed murdered his stepson. Without this crucial information, Defendants were faced with no choice at all because the situation was never brought to their attention in the first instance.

In certain situations, however, the need for training "can be said to be 'so obvious,' that failure to do so could properly be characterized as 'deliberate indifference' to constitutional rights" even without a pattern of constitutional violations. *City of Canton v. Harris*, 489 U.S. 378, 390 n.10 (1989). Liability in a single-incident case depends on "[t]he likelihood that the situation will recur and the predictability that an officer lacking specific tools to handle that situation will violate citizens' rights." *Bryan Cnty.*, 520 U.S. at 409 (1997).

In addition to deliberate indifference, the Plaintiff must also be able to establish a causal nexus between the injury and the alleged deficient training or supervision. The Third Circuit has stated, "to sustain a claim based on a failure to train theory, 'the identified deficiency in [the] training program must be closely related to the ultimate [constitutional] injury.'" *Colburn v. Upper Darby Township*, 946 F.2d 1017, 1028 (3d Cir. 1991) (*quoting City of Canton,* 489 U.S. at 391). Causation is a requirement for failure to train liability that is separate from deliberate indifference; however, "[t]he high degree of predictability [in a single-incident case] may also support an inference of causation — that the municipality's indifference led directly to the very consequence that was so predictable." *Bryan Cnty.*, 520 U.S. at 409-10.

The *Monell* failure to train and supervise claim fails because Plaintiff has not come forward with evidence to establish that a pattern or practice of improperly monitoring the inmate housing area led to inmate assaults at CFCF. Contrary to the Plaintiff's position, CFCF had an established system for monitoring the inmate housing area. (*Expert Report of Edward Sweeney* at 7-8, ECF No. 11-8.) One aspect of this system was the use of duty logs with "Housing Unit" post orders. (*Id.*) During shift changes, outgoing correctional officers were to fill out duty notes that would be reviewed by incoming officers at shift changes. The incoming officers could then adjust their course of action accordingly. (*Id.*)

Plaintiff fails to set forth evidence suggesting that the City of Philadelphia or its supervisors were aware of any problem with the established policy for monitoring the housing area. Plaintiff's case is simply devoid of this type of pattern or practice of permitting violent assaults within the Philadelphia County Prison System. Plaintiff came forward with no similar examples of situations where an inmate entered another inmate's cell for the purpose of committing a violent crime. Assuming there was an oversight by correction officers in this particular case, this isolated incident does not create liability under *Monell* without establishing a pattern or practice of failing to monitor inmates while they are in their cells or in the common areas of cellblocks.[6] A pattern of oversight resulting in injury to inmates would place supervisors and administrators in the Philadelphia Prison System on notice of the need for an enhanced training system or more specialized supervision. *See generally Connick v. Thompson*, 563 U.S. 51 (2011). However, Plaintiff has failed to adduce evidence of such a pattern here. Plaintiff's attempt to establish causation also fails because he cannot establish that a failure to train or supervise was directly related to his injuries when he did not apprise correctional officers about the situation with William.

---

[6] Third Circuit precedent establishes that a *Monell* failure to train and supervise claim might survive in the absence of evidence to suggest that any of the individual officers violated a plaintiff's constitutional rights. It suggests, therefore, an independent basis for a *Monell* claim based on a failure to train and supervise. *Fagan v. City of Vineland*, 22 F.3d 1283, 1294 (3d Cir. 1994); *Thomas v. Cumberland County*, 749 F.3d 217 (3d Cir. 2014). However, given the facts in the case *sub judice*, the Plaintiff's *Monell* claim is deficient where, as discussed above, he cannot establish that the individual correction officers committed a constitutional violation in failing to protect him. Therefore, their training and supervision is not suspect. *Vargas v. City of Philadelphia*, 783 F. 3d 962, 975 (3d Cir. 2015) ("Because the officers did not violate any of her constitutional rights . . . there was no violation for which the City of Philadelphia could be held responsible."); *Mulholland v. Government County of Berks*, 706 F.3d 227, 238 n.15 (3d Cir. 2013) ("It is well-settled that, if there is no violation in the first place, there can be no derivative municipal claim.").

## C. Failure to Provide Medical Care (Count III)

Plaintiff's claim that he received inadequate medical care while in the Philadelphia Prison System contradicts the factual record in this matter. [7] Plaintiff's medical records from the relevant time period establish that he was treated for injuries and medical ailments while housed in the Philadelphia Prison System. Prison officials were not "deliberately indifferent" to the Plaintiff's medical needs. The fact that Plaintiff did not agree with the course of treatment is not sufficient to establish a constitutional violation.

The Eighth Amendment proscription against cruel and unusual punishment requires that prison officials provide inmates with adequate medical care for serous medical needs. *Estelle v. Gamble*, 429 U.S. 97, 103-104 (1976). In order to set forth a cognizable claim for a violation of his right to adequate medical care, an inmate must allege: (1) a serious medical need; and (2) behavior on the part of prison officials that constitutes deliberate indifference to that need. *Id*. at 106. The Third Circuit has defined serious medical needs as: "one that has been diagnosed by a physician as requiring treatment"; (2) "one that is so obvious that a lay person would recognize the necessity for a doctor's attention"; or (3) one for which "the denial of treatment would result in the unnecessary and wanton infliction of pain" or "a life-long handicap or permanent loss." *Atkin v. Taylor*, 316 F.3d 257, 272-73 (3d Cir. 2003).

At his deposition, Plaintiff made various claims related to his allegations that Defendants failed to provide appropriate medical care. For example, he averred that on return from the

---

[7] Plaintiff failed to file a grievance and exhaust administrative remedies with respect to his claim that correctional officers and prison officials were deliberately indifferent to his medical needs. Plaintiff, who remains incarcerated in the state prison system, avers that prison officials failed to provide appropriate medical care following his release from the hospital. (*Ellis Dep.* at 50, 80-81, 101-102.) Had Plaintiff filed a grievance and made use of administrative remedies, he might have received the medical care that he avers was not provided. Plaintiff might still file a grievance at the present time and receive medical care for his ongoing complaints that he claims have not been addressed.

hospital to CFCF, he was not provided with a wheelchair and was forced to use a cane to ambulate. (*Ellis Dep.* at 27.) However, looking at this specific claim, it cannot be said that the decision to provide a cane for ambulation was inappropriate. *Inmates of Allegheny Cnty. Jail Pierce*, 612 F.2d 754, 762 (3d Cir. 1979) (deference is given to prison medical authorities in the diagnosis and treatment of patients, and courts "disavow any attempt to second-guess the propriety or adequacy of a particular course of treatment . . . (which) remains a question of sound professional judgment."); *Estelle*, 429 U.S. at 105-06 (medical professionals may exercise dicretion in treatment and allegations of negligent treatment or medical malpractice do not trigger constitutional protections). Plaintiff, without the support of expert medical testimony, goes on to claim that he was provided with only one mattress for his bed instead of two mattresses which caused his back to heal improperly. (*Ellis Dep.* 50, 80-81). Yet, there is nothing in the record to establish that Plaintiff required two mattresses or that the lack of appropriate bedding caused or exacerbated injury to his back.[8]

When Plaintiff was released from the hospital, his discharge papers recommended removal of scrotal stitching, follow up with an Oral and Maxillofacial surgeon, and follow up with primary care provider. (ECF No. 19-1 at 12.) Plaintiff was seen by prison medical staff immediately upon arriving back at CFCF on November 25, 2016. His scrotal stitching was evaluated and determined to be absorbable sutures that did not require removal. (ECF No. 11-11 at 5.) As previously discussed in the fact section above herein, the Plaintiff was evaluated by an

---

[8] The failure to clearly define the lapse in medical care that occurred in the Philadelphia Prison System is fatal to Plaintiff's claim of deliberate indifference. This Court will not scour the record to uncover evidence of inappropriate medical care in an attempt to build Plaintiff's case. *Doeblers' Pa. Hybrids, Inc. v. Doebler*, 442 F.3d 812, 820 n. 8 (3d Cir. 2006) ("As noted by the Seventh Circuit, 'Judges are not like pigs, hunting for truffles buried in the record.'" *Ecore Int'l, Inc. v. Downey*, 343 F. Supp. 3d 459, 498 (E.D. Pa. 2018).

Oral and Maxillfacial surgeon who determine that Plaintiff was not a candidate for surgical intervention.

Plaintiff also testified that he was to see a specialist for treatment of fractured vertebrae. (*Ellis Dep*. at 99.) Plaintiff testified that he was not sent to see a specialist for his fractured vertebras. (*Id.*) However, Plaintiff's testimony establishes he never asked to see a specialist for his fractured vertebras, and that he had instead requested physical therapy, (*Id.* at 99.), a request that was granted. Although there might have been some delay, Plaintiff in fact received physical therapy. (ECF No. 11-9 78, 76-88, 90-94 & 98.) Plaintiff also received treatment for his facial injury, damaged tooth or teeth, and he was referred to an optometrist for complaints about blurred vision. The record in this instance is replete with medical treatment provided in the Philadelphia Prison System. (See Fact § herein above.)

### D. Municipal Liability (*Monell* Claim) Denial and Delay in Providing Medical Care - Failure to Train and Supervise

The Plaintiff's *Monell* claim based on a failure to provide medical care is equally deficient because, as previously discussed, he received a range of medical treatment for his various ailment while housed in the Philadelphia Prison System. Plaintiff has simply failed to establish that the care he received was deficient in anyway. The records establish that he was evaluated by prison medical staff who pursued a course of treatment.

### E. Procedural Due Process Violation of the Fourteenth Amendment

The Plaintiff's procedural due process claim fails because he cannot show that he faced a deprivation of a protected liberty interest as a result of being placed in disciplinary confinement. Absent evidence that conditions of confinement imposed an atypical and significant hardship in relation to ordinary prison life, an inmate is not entitled to procedural protections required by due process during prison disciplinary proceedings and subsequent confinement. *Sandin v. Conner*,

515 U.S. 472, 484 (1995); *Smith v. Mensinger*, 293 F.3d 641, 653 (3d Cir. 2002) (seven months in disciplinary segregation did not violate a protected liberty interest); *Griffin v. Vaughn*, 112 F.3d 703, 706-708 (3d Cir. 1997) (fifteen months in administrative custody did not raise a due process liberty interest because the confinement did not raise a liberty interest); *Young v. Beard*, 227 F. Appx. 138, 141 (2007) (nine hundred and eighty days in disciplinary segregation did not amount to cruel and unusual punishment and due process rights were not triggered without a showing that confinement "imposes atypical and significant hardship on the inmate in relationship to the ordinary incidents of prison life.").

After being released from the hospital and returning to CFCF, the Plaintiff testified that he was placed in administrative segregation or protective custody. (*Ellis Dep.* at 62.) He was found to have violated prison policy for engaging in a fight, so he filed an Inmate Disciplinary Hearing Appeal which was denied. (*Id.* at 53-54.) During the internal disciplinary appellate process, Plaintiff was provided with a hearing and was permitted to present his version of events that lead to the attack by William. (*Id.* at 63.) Plaintiff testified that he ultimately received sixty days in solitary confinement followed by administrative segregation in connection with the attack. (*Id.* at 65.)

Plaintiff's chief complaint was that solitary confinement and administrative segregation implicated his due process liberty interest because it caused a delay in receipt of medical care. (*Opp. Brief* at 14 (ECF No. 12); *Ellis Dep*. at 50.) Plaintiff argues that his medical condition after release from the hospital coupled with his confinement in punitive segregation created an atypical hardship. (*Id.*) As previously discussed above, Plaintiff's own testimony established that he received medical treatment even while he was being held in administrative segregation.

19

Therefore, he fails to establish an atypical hardship that is necessary to state a claim for due process violation in a prison disciplinary proceeding.

**IV.   Conclusion:**

For the reasons stated above, this Court will grant the motion for summary judgment filed by Defendants. An appropriate order follows.

BY THE COURT:

/s/ Judge John M. Younge
Judge John M. Younge